FILED

07 JUN -5 PM 3: 30

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

E-filing

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | C 07 2926 |
| Plaintiff and Respondent | Petition for Writ Of Error Coram Vobis |
| v. | SBA |
| ARASHIEK WESLEY WILLIAMS | (PR) |
| Defendant and Appellant | |

Petition for Writ of Error Coram Vobis to vacate a judgment
rendered against petitioner and entered on or about February 09, 1996, in the
Superior Court of the State of California for the city of San Jose, County of
Santa Clara, Superior Court case No. 178305 following a plea of "Not Guilty."

DISCUSSION

REVIEW IS JUSTIFIED IN THIS CASE TO

DECIDE AN IMPORTANT ISSUE OF LAW AND

TO CORRECT A MISCARRIAGE OF JUSTICE


Petitioner's Coram Vobis not Barred by Successive Petitions Rule


On November 16, 2006, case #S147914, petitioner's petition for Coram Vobis was transferred to the Sixth Appellate District by the California Supreme court.   The Sixth Appellate District denied petitioner's Coram Vobis for being substantially identical to a prior petition.


Petitioner agrees that his current Coram Vobis is substantially identical to his prior habeas Corpus that was filed with both the Appellate Court and the California Supreme Court.   It should be noted that as a layman at law, petitioner did not know that the habeas corpus was not the proper vehicle to be used to adjudicate the issues he is presently raising in this petition. Judge Alfonso Fernandez, of the superior court of Santa Clara County, stated in his denial of petitioner's original habeas corpus that petitioner was no longer in custody for habeas corpus purposes for my prior conviction, and "Additionally, petitioner has not shown that he is serving any enhanced sentenced due to this prior so that he could challenge the prior."   This led petitioner to believe that he could use the habeas corpus to raise the unconstitutional violations of his prior case if his current sentence was enhanced based on those convictions.   However, petitioner has found out after utilizing the habeas corpus to the Federal court that this was not the case.

In 2001, the U.S. Supreme court held in COSS that only two issues could be raised when attacking a prior conviction when a petitioner is no longer "in custody" for habeas corpus purposes: 1)Defendant was completely denied an attorney and 2)Actual Innocence.  Petitioner raised neither of these claims in his petition.  Therefore, the lower courts lacked the ability to ever really consider the merits of petitioner's petition.  Petitioner argues that this in itself meets the criteria of **Hagan v. Superior Court (1962) 22 Cal. Rptr. 206, 208, 57 Cal. 2d 767** of an unusual circumstance that would allow court to hear a successive petition.  Furthermore, **In re Clark (1993) 5 Cal. 4th 750, 21 Cal. Rptr. 2d 509,** states in part, "Successive or untimely petitioners **will** **not** be summarily denied where a petition alleges facts that, if proven, would establish that a fundamental miscarriage of justice occurred as a result  of the proceedings leading to conviction or sentence." **CLARK** goes on to enumerate four points, any of which, will constitute a fundamental miscarriage of justice: (1) that error of constitutional magnitude lead to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner, (2) that petitioner is actually innocent of the crime or crimes of which he or she is convicted, (3) that the death was imposed by a sentencing authority that had such a grossly misleading profile of the petitioner before it that absent the error or omission no reasonable judge or jury would have imposed a sentence of death, and (4) that the petitioner was convicted under a invalid statute. Petitioner contends that his coram vobis meets two of CLARK'S points, numbers one and four. (See **petitioner's Points and Authorities** for **in depth** arguement).

In this case petitioner was denied his right to a jury trial, by having a deliberating juror removed due to an erroneous instruction, denied notice

1 | of the charges against him, denied effective assistance of counsel, and denied

2 | a fair trial because of the cumulative effect of the errors present in

3 | petitioner's case.   Because of the important issues of law raised by this

4 | case, this court should grant review and reverse Mr. Williams's conviction.

CONCLUSION

For the reasons stated herein, the petitioner respectfully requests that
this Court grant review and reverse the judgment of conviction.

Dated: 5/29/07

Respectfully submitted:



Arasheik W.L. Williams

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) NO. <br> ) <br> ) |
| Plaintiff and Respondent | ) Petition for Writ Of <br> ) Error Coram Vobis |
| v. | ) <br> ) |
| ARASHIEK WESLEY WILLIAMS | ) <br> ) |
| Defendant and Appellant | ) |

Petition for Writ of Error Coram Vobis to vacate a judgment rendered against petitioner and entered on or about February 09, 1996, in the Superior Court of the State of California for the city of San Jose, County of Santa Clara, Superior Court case No. 178305 following a plea of "Not Guilty."

STATEMENT OF THE CASE

On February 14, 1995, Arashiek Wesley Williams, appellant, was charged in an 11-count information with committing various crimes against Jennifer Babcock. The information consisted of the following charges:

1. Three counts of false imprisonment in violation of Penal Code section 236/237, with each count also alleging appellant used a dangerous and deadly weapon during the

1

commission of the offenses within the meaning of Penal Code sections 667, 1192.7, and 12022, subdivision (b). (CT 141, 144, 147.)

2. Two counts of assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1), with each count also alleging appellant used a dangerous and deadly weapon during the commission of the offenses within the meaning of Penal Code sections 667 and 1192.7. (CT 142-143.)

3. One count of rape in violation of Penal Code section 261, subdivision (A)(2), with an allegation appellant used a deadly weapon within the meaning of Penal Code section 12022.3, subdivision (a).[1] (CT 142.)

4. Two counts of assault by means of force likely to produce great bodily injury in violation of Penal Code section 245, subdivision (a)(1), with one of the counts containing an allegation that appellant actually inflicted great bodily injury within the meaning of Penal Code sections 12022.7, subdivision (a) and 1203, subdivision (e)(3). (CT 145, 146-147.)

5. One count of battery with serious bodily injury in violation of Penal Code section 242/243, subdivision (D), with an allegation that appellant personally inflicted great

---

[1] Originally, this count also contained an allegation that appellant used a deadly and dangerous weapon during the commission of the offense in violation of Penal Code section 12022.3, within the meaning of Penal Code sections 667.61, subdivisions (b) and (e). However, this allegation was dismissed by the prosecution. (CT 143.)

bodily injury within the meaning of Penal Code sections 667 and 1192.7.  (CT 146.)

6.  One count of torture in violation of Penal Code section 206, with an allegation that appellant used a dangerous and deadly weapon during the commission of the offenses within the meaning of Penal Code sections 667, 1192.7, and 12022, subdivision (b).  (CT 148.)

7.  One count of assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1), with an allegation that appellant used a dangerous and deadly weapon during the commission of the offenses within the meaning of Penal Code section 12022, subdivision (b).  (CT 145.)

After completion of a jury trial, appellant was acquitted of all charges except the following: (1) the torture count (CT 285); (2) one count of assault by means likely to cause great bodily injury, with a finding that appellant inflicted great bodily injury (CT 283); and (3) one count of false imprisonment.  (CT 284.)  Appellant was also convicted of unlawful sexual intercourse as a lesser included offense of rape.  (CT 274.)  The court imposed a sentence of six years confinement, with 578 days credit for time spent in custody. This sentence consisted of a three-year term for assault by means of force likely to cause great bodily injury, enhanced by a three-year term for causing great bodily injury.  A three-year term was also assessed on the false imprisonment

3

count, but that was stayed pursuant to Penal Code section 654. A six-month term was assessed for unlawful sexual intercourse, with that term running concurrently with the three-year state prison term. (CT 662.) A life sentence was imposed for the torture conviction, but that term was stayed pursuant to Penal Code section 654. (CT 663.)

Appellant made a post-trial Marsden motion, which was denied. (CT 659.) Appellant's motion for new trial was also denied. (CT 660.) Appellant filed a timely notice of appeal on February 9, 1996. (CT 665.)

//

//

## STATEMENT OF FACTS

### Overview

Appellant and Jennifer Babcock, a manic depressive with a history of extensive marijuana use (RT 1074), had a dating relationship for a period of time during 1994 and 1995. There was conflicting testimony as to whether appellant was concerned with controlling Ms. Babcock or whether Ms. Babcock was possessive and protective of her relationship with

appellant.  All of the allegations in the information arose from incidents allegedly occurring between the two of them on December 31, 1994, January 1, 1995, and January 9, 1995.

After a 22-day trial, the jury returned verdicts indicating it disbelieved Ms. Babcock's testimony regarding the disputed incidents of December 31, 1994, and January 1, 1994.  The jury acquitted appellant of all charges arising from acts allegedly occurring on these two dates.[2]  The only convictions rendered in this case related to the acts which were alleged to have occurred on January 9, 1995.

Since there were no percipient witnesses to the alleged incidents, much of the trial testimony related to issues regarding the credibility of appellant and the victim. Rather than relate this testimony here, to the extent it is relevant it will be discussed in the Argument portion of the brief.  The testimony relating to the incidents which formed the basis of the information is set forth below.

Incidents of December 31, 1994

Late in the afternoon on December 31, appellant, Ms. Babcock, and Chris Perez were all at Ms. Babcock's house.  (RT 392.)  According to Ms. Babcock, appellant ordered her to go upstairs (RT 393), and after she got upstairs he told her to

_____

[2]  The jury did convict appellant of having unlawful sexual intercourse on December 31, 1994, as a lesser offense of the rape allegation in count three.  However, appellant admitted to having sexual relations with Ms. Babcock on that date, while denying that it constituted rape; a denial credited by the jury.

take off her clothes and lay on the bed. She testified she did not want to do this, but did so because appellant would get mad if she did not comply. (RT 397-399.) Appellant then left the room and returned with some knives. (RT 402.) He began sharpening the knives and told Ms. Babcock he wanted her to masturbate and perform oral sex on him. She testified she did not want to do these things. (RT 406.) However, she told appellant she would do these things later; whereupon he started poking her with the knives and talked about body parts he would cut. (RT 407, 409.)

Appellant and Ms. Babcock then had sexual intercourse on a desk in the room. Ms. Babcock testified that she did not want to do this, but did it because appellant told her to do so. (RT 413.) She stated that appellant told her that if she screamed she would be dead by the time Chris Perez arrived in the room. (RT 415.) After the act of sexual intercourse, appellant got dressed and Ms. Babcock took a shower. (RT 416.)

Appellant and Ms. Babcock were then picked up by Willie Pestoriza and Aisha Dalton and driven to a New Year's Eve party being held at Aisha's home. (RT 428, 430.) During this drive Ms. Babcock engaged in banter about just having had sexual intercourse with appellant. (RT 628, 809, 2046, 2090.) According to Ms. Babcock, they spent no more than 20 minutes at this party. (RT 432.) During the time they were at the party, she told no one about defendant's earlier actions.

Nor, according to her, did she act physically close to appellant. She stated she did not hold hands with appellant or hug him. (RT 447.)

After leaving Aisha's party, she and appellant went to a party at the Dumetz home, and then spent 20 minutes in a friend's car smoking marijuana. (RT 435, 443.) Upon leaving the car, they returned to the Dumetz home for a period of time, after which they returned to Ms. Babcock's home. (RT 448, 453.) Appellant and Ms. Babcock were driven to her home by Chuck Mostek, and the three of them arrived there at 12:30 a.m. (RT 453-454.)

Regarding the activities of early in the evening on December 31, 1994, Chris Perez testified that he would have seen appellant if he had taken knives from the kitchen and gone upstairs with them, and he did not observe any such act. (RT 2138.) However, he did testify that after not having seen appellant for a period of 15 minutes, he went upstairs and saw Ms. Babcock walk out of a spare bedroom with a smile on her face. (RT 2138.) He then went into that room and saw appellant changing his clothes; he did not see any knives. (RT 2139.) He then talked to Ms. Babcock and observed that her mood was normal. (RT 2140.)

The next evening both appellant and Ms. Babcock came to his house, where he was having a party. (RT 2050-2051.) Ms. Babcock told him that she received a black eye by getting into a fight at a party the night before. (RT 2154.)

However, she later told him that defendant had hit her and also made her have sex with him at knife point on New Year's Eve. (RT 2166.)

Yolanda Brown testified that she attended the New Year's Eve party at Aisha Dalton's home and observed appellant and Ms. Babcock. (RT 2027.) It was her opinion that Ms. Babcock was "all over" appellant. (RT 2029.) She was holding his hand and hugging him (RT 2030), and seemed neither injured nor afraid of him. (RT 2033.) These observations were confirmed by Aisha Dalton, Willie Pestoriza, Clarence Daulton, Jr., Dina Williams, and Hazel Bautiste, all of whom testified that Ms. Babcock was very close to appellant and followed him around. (RT 2047, 2061-2063, 2092, 2102, 2105, 2112-2113.)

Appellant testified and admitted to having sex with Ms. Babcock on December 31, 1994, prior to going to the party at Aisha Dalton's home. However, he said this was consensual and did not involve the use of knives or threats. (RT 2773-2774.)

Incidents of January 1, 1995

Ms. Babcock testified that Chuck remained at her home for 20 or 25 minutes. After he left, appellant went upstairs and Ms. Babcock followed shortly thereafter. (RT 456-457.) Ms. Babcock got into bed and, after he put a movie in the VCR, appellant laid down next to Ms. Babcock. (RT 473.) Ms. Babcock fell asleep. (RT 475.) Later, she awoke and saw appellant standing over her holding a knife. (RT

476.)  Appellant grabbed her ankle and pushed the knife into it and cut her.[3]  (RT 477.)  Appellant then jumped on her and began punching her.  This lasted for a few minutes and Ms. Babcock was screaming during this episode.[4]  (RT 479.) Appellant then grabbed her by the hair and "directed" her down the stairs and into the living room.  When they arrived at the bottom of the stairs, appellant flung her on the couch and her body hit both the floor and the couch.  (RT 480-482.)

Appellant then accused Ms. Babcock of lying about what she said she would do, and he slapped her on the face more than 15 times.  (RT 483-484.)  She then complied with his earlier request regarding oral sex.  (RT 485.)  According to Ms. Babcock, while they were downstairs appellant placed a knife on her left side.  (RT 489.)  She told no one about this sex act, nor did she testify about it at the preliminary hearing.  (RT 490.)

After these events, Ms. Babcock went back upstairs and went to sleep.  (RT 494.)  Upon awaking the next day, she saw that her right eye was swollen and there were bruises on

_____

[3]  Ms. Babcock said when she awoke on the morning of January 1, she found blood "everywhere."  (RT 526.)  She washed the bedding, but the blood did not come out of the pillows or comforter.  (RT 528.)  These items were examined by a serologist who testified that neither appellant nor Ms. Babcock could be eliminated as possible sources for the blood. (RT 1259.)  Appellant testified that he got blood drops on the bedding when he cut his finger on some glass during a December visit.  (RT 2761.)

[4]  Ms. Babcock's next-door neighbors testified that they heard no unusual noises that night, nor did their dog bark at any noises.  (RT 2452, 2461.)

9

her legs and above her left eye.  (RT 497.)  She asked
appellant how she would be able to explain her swollen eye and
he made up a story about her going to a party and getting into
a fight with another girl.  (RT 498.)  She subsequently told
this story to Diane Dumetz, Paul Dumetz, and her father.  (RT
499, 504, 1143, 2318.)  She related to others that she had
been hit in the eye by a softball.  (RT 1335, 1450.)

Ms. Babcock testified that sometime between January
1 and January 9, 1995, she told Bonnie Dillon and Kathy Mares
the truth about how she had received the injury to her eye;
although she said nothing about the alleged sexual assaults.
(RT 530-531, 1486.)  Bonnie Dillon confirmed this testimony.
(RT 1330.)  Kathy Mares testified that she spoke to appellant
on New Year's Day and he told her he did not know why he did
it and that he was sorry.  (RT 1488.)

Chuck Mostek testified that on New Year's Eve he
picked appellant and Ms. Babcock up at the Dumetz home and
took them to Ms. Babcock's house.  (RT 2327.)  Appellant and
Mr. Mostek stayed there for one and one-half to two hours.
(RT 2330.)  Mr. Mostek was with appellant the entire time, and
observed appellant being paged twice, as well as appellant
being on the phone once.  (RT 2331.)  They subsequently left
Ms. Babcock's house and drove to Edwin Hartell's house, where

Mr. Mostek left appellant at about 2:00 or 2:30 a.m. on January 1, 1995.[5]  (RT 2334-2336.)

Later that day, Mr. Mostek picked Ms. Babcock up at her house in order to take her to a party at the home of Chris Perez.  When he did so he noted that she had a black eye, whereas she had no marks on her when he and appellant had left her early on the morning of January 1.  She told him that she had received the black eye from engaging in a fight at a party.  (RT 2336-2337.)

Edward Hartell testified that appellant arrived at his house on January 1 between 2:00 and 2:30 a.m. and stayed until approximately 6:00 a.m.  (RT 2392.)  Julie Wilhelm stated that she called Edward Hartell at his home at about 2:30 a.m. on January 1 and spoke to both Mr. Hartell and appellant.  (RT 2439.)

Appellant testified that after he, Ms. Babcock, and Chuck Mostek returned to Ms. Babcock's house, he made arrangements with Edward Hartell to spend the night at his house.  (RT 2793.)  He and Mr. Mostek left Ms. Babcock's house after Ms. Babcock informed them that they needed to leave before her father came home.  (RT 2795.)  Appellant went to Mr. Hartell's house and arrived while Mr. Hartell was talking to someone on the phone.  Appellant also talked to this person.  (RT 2797-2798.)

---

[5]   Detective Dale Harris testified on rebuttal that he interviewed Mr. Mostek, who told him that he left Ms. Babcock's house alone sometime after 2:00 a.m.  (RT 3107.)

11

Appellant left Mr. Hartell's house at about 6:00 a.m. on January 1 and returned to his grandmother's house. (RT 2800.) He left there at about 11:00 a.m. and walked to Ms. Babcock's house. He arrived at her house between 11:30 and 12:00. When he observed her black eye, a condition that did not exist when he had left her the night before, she told him she had received it in a fight. (RT 2804, 2806.)

At about 11:00 or 11:30 a.m. on January 1, 1995, Diane Dumetz, Rachel Urshera, and Paul Dumetz arrived at Ms. Babcock's house to deliver Ms. Dumetz' granddaughter to Ms. Babcock for babysitting purposes. (RT 2235.) Ms. Babcock told them that she was the only person in the house, and that she had received her black eye in a fight at a party in Morgan Hill the previous night. (RT 2236-2237, 2287, 2292.)

Paul Dumetz said that he spoke to appellant at about 1:00 a.m. on January 1, 1995. (RT 2312.) Further, he had told appellant that if appellant did not have a place to stay that night, appellant should page him. Appellant did so between 1:45 and 2:15 a.m. (RT 2313-2314.) Subsequently, Mr. Dumetz spoke to Chuck Mostek, and this alleviated his concerns about where appellant would be spending the night. (RT 2315.) He also received a page that had appellant's code and was from Ed Hartell's phone number. (RT 2482.)

Alberta Williams testified that she saw appellant at about 6:00 a.m. on January 1, 1995, and that he was with her until 11:00 or 11:30 a.m. (RT 2554-2555.) She also testified

12

that in the days following January 1, appellant received a phone call from Ms. Babcock in which she asked appellant to ask Mrs. Williams what would cause her to be spitting up blood. (RT 2555.)

Jody Olney testified that she picked appellant up at Ms. Babcock's home about noon on January 1. (RT 2506.) When she arrived, appellant and Ms. Babcock were standing by the fence and they hugged each other goodbye. (RT 2507, 2509.)

Incidents of January 9, 1995

Ms. Babcock testified that on January 9, 1995, she was awakened by a shoe that had been thrown against her window. (RT 532.) When she went downstairs she found the defendant standing outside. According to her, he was mad because he had been forced to sleep outside on the evening of January 8, and he ascribed this to her actions. (RT 533.) Appellant then made her stand outside in a puddle as punishment. (RT 537.)

After the puddle incident, Ms. Babcock and appellant went to Ms. Babcock's bedroom. (RT 547.) Upon arriving in her room, appellant hit Ms. Babcock in the face because she forgot his birthday. (RT 548.) Appellant then punched her several times more and dragged her down the stairs by her hair. (RT 551.)

She testified that while she was lying on the ground, appellant put a dog collar around her neck and placed a chair over her. (RT 553, 557.) Appellant then placed

13

knives on her chest and mentioned specific parts of her body

that he could cut off with each knife.  (RT 564.)  According

to Ms. Babcock, appellant made a list on a piece of paper of

things he could do to her.  He then had her number the list in

descending order, beginning with her most favorite body part.

(RT 565, 567.)  This was done because appellant told her

whenever she lied, cheated on him, or made him mad he would

cut off parts starting from the least favorite and working

toward the most favorite.  (RT 569.)

     Ms. Babcock informed appellant that she believed she

needed to go to the hospital, but appellant merely laughed.

(RT 570.)  They then smoked marijuana.[6]  (RT 571.)  Appellant

also told her that he wanted her to masturbate herself and she

complied with this request because she feared making appellant

angry.  (RT 575-576.)  Between 12:30 and 1:00 p.m., appellant

left Ms. Babcock's home.  (RT 577.)

     After appellant left, Ms. Babcock took aspirin and

remained on the couch; she called neither the police nor a

hospital.  (RT 578.)  When her father returned home, she told

him that she felt bad, but did not tell him the cause of her

pain.  Her father took her to Dr. Freedlander for her

regularly scheduled psychiatric appointment.  (RT 581.)

     Ms. Babcock told Dr. Freedlander that she was in

pain because appellant had hit her.  She stated that she told

_____

     [6]  This testimony contradicted an earlier statement where
Ms. Babcock had told the police that the defendant had not
smoked marijuana on that day.  (RT 615.)

him this because she believed the confidentiality privilege would prevent him from telling anyone. After examining her, he advised her to go to a hospital.[7] (RT 582.) Accepting this advice, her father took her to Good Samaritan Hospital. (RT 583.)

Ms. Babcock stayed in the hospital four days, but did not tell anyone at the hospital what had happened. (RT 584-585.) While in the hospital, she received a phone call from a policeman and she told him she did not know the name of the person who had hurt her. (RT 586.) She also withheld this information from Detectives LoCicero and Harris when they visited her in the hospital. (RT 589.)

Candace Alicia testified that she drove appellant to Jennifer Babcock's house on January 9, 1995. (RT 1863.) She waited in the car for ten minutes for him while he went to retrieve a wallet which he had left there. (RT 1866.) Ms. Alicia estimated that it was about 10:00 a.m. when they were at Ms. Babcock's house. (RT 1869.) They then returned to appellant's home, where they remained for the rest of the day. (RT 1870.) At about 11:30 a.m. appellant called the Alexian Brothers Hospital because of pain his grandmother was having. (RT 1871.) At about 2:40 p.m., Ms. Alicia and appellant took appellant's grandmother to her doctor. (RT 1880-1881.) Subsequently, they checked her into the hospital. (RT 1884.)

---

[7] Dr. Freedlander also told her father the information she had told him during the psychiatric session. (RT 583, 1095.)

Jennifer Cook testified that she called appellant at his home between 11:00 and 11:30 a.m. on January 9 and spoke to him on the telephone. (RT 2469.) Dr. Jose Maria Guanzon testified to having received a phone call from appellant between 12:30 and 1:30 p.m. on January 9 regarding his grandmother. (RT 2577.) The doctor saw Mrs. Williams in his office sometime after 3:00 p.m. on that day. (RT 2580.)

Alberta Williams, appellant's grandmother, testified that Candace Alicia picked appellant up at about 9:20 a.m. on January 9, and they returned to her home about 45 minutes after they left. (RT 2541.) Upon returning, appellant went to his room, and Candace and Mrs. Williams watched television. (RT 2541.) At about 2:20 p.m. they all went to Dr. Guanzon's office because of chest pains that Mrs. Williams had been experiencing. (RT 2543.)

Appellant testified that he went to Ms. Babcock's house on January 9 to retrieve his wallet. (RT 2838.) While there, he told Ms. Babcock that he no longer wished to see her and she became upset. As they were walking down her stairs, she stumbled and appellant caught her. He then left. (RT 2845.) Appellant denied that he performed any of the acts testified to by Ms. Babcock. (RT 2900-2901.)

After returning to his home, he later took his grandmother to her doctor and checked her into the hospital. (RT 2906-2915.)

16

1    Chris Perez testified that he had several visits with Ms. Babcock after
2  she was released from the hospital.  During these visits they smoked marijuana
3  together, and she informed him that she injured her spleen by slipping and
4  falling on a sprinkler.  (RT 2158-2159.)

5    During trial and after defense counsel had presented its defense in
6  full, trial court informed defense counsel that it would be giving the lesser
7  included offense instruction that unlawful sexual intercourse, p.c. 261.5 was
8  a lesser included offense of rape, p.c. 261.  (Hereafter referenced as p.c.
9  261 and p.c. 261.5.)  Defense counsel objected, stating that 261.5 was not
10  a lesser included offense of 261, and cited **People v. Lohbauer (1981) 173 Cal.**
11  **Rptr. 453, 29 Cal. 3d. 364** as an authoritive case.  The trial court read this
12  case into the record, but overruled defense counsel's objection.

13    Then during the course of deliberations, the foreperson of the jury
14  sent the court a note stating that juror James Kelly refused to adhere to the
15  court's instruction regarding p.c. 261 and p.c. 261.5 because he believed the
16  law to be wrong.  The note further stated that he would not "hear any
17  discussions." (RT 3647.)  The court removed Mr. Kelly from the jury room and
18  engaged him in brief questioning, resulting in an order dismissing him from
19  the jury.  This was effected over petitioner's objection.  (RT 3648-3650.)

20
21                          **EXHAUSTION OF REMEDIES**

22    Due to petitioner's current conviction, he is no longer "in custody"
23  for habeas corpus purposes to directly challenge his previous convictions,
24  even though his current sentence has been enhanced Due to these
25  unconstitutional priors.  Therefore, petitioner has no other plain, speedy,
26  or adequate remedy available except a Writ of Error Coram Vobis.

27
28

ARGUMENT AND

POINTS AND AUTHORITIES

I

Petitioner Denied Due Process Right To Notice

Of The Charges Against Him

After the presentation of the defenses case in chief, in which the petitioner testified to having consensual sex with Ms. Babcock, the trial court informed defense counsel that it would be including the instruction that unlawful sexual intercourse p.c. 261.5 was a lesser included offense of rape, p.c. 261 (hereafter referenced as p.c. 261.5 and p.c. 261). Defense counsel objected, stating that p.c. 261.5 was not a lesser included offense of 261. Defense counsel even cited <u>People v. Lohbauer (1981) 173 Cal. Rptr. 453, 29 Cal. 3d. 364</u> as an authority on the point. The trial court read the case into the record, and then overruled defense counsel's objection.

The giving of this instruction violated petitioner's right to "Notice" of the charges against him. For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they might enjoy that right they <u>must first be notified.</u>" (Fuentes v. Shevin 407 U.S. 67, 80, 92 S. Ct. 1983, 1994 (1972) (quoting Baldwin v. Hale 68 U.S. (1 Wall.) 223, 233, 17 L. Ed. 531 (1864)). "<u>Adequate Notice</u> included the dual safeguards of disclosure of the issues to be addressed and sufficient time for preparation. (In re Gault 387 U.S. 1, 33, 87 S. Ct. 1428, 1446 (1967)).

### A.  P.C. 261.5 Is Not A Lesser Included
### Offense Of P.C. 261.

California case law is clear: "Unlawful sexual intercourse is not a lesser included offense of rape. (People v. Chapman (1975) 47 Cal. App. 3d. 597). Therefore, "When a defendant pleads not guilty, court lacks jurisdiction to convict him of an offense that is neither charged nor necessarily included in the alleged crime. (People v. Lohbauer (1981) 173 Cal. Rptr. 453, 29 Cal. 3d. 364, see also Olais-Castro v. U.S. 416 F.2d 1155 (9th Cir. 1969; and Franks v. Alford 820 F.2d 345 (C.A. 10 1987) [The elements of a lesser included offense must necessarily be included in the offense charged]). This lack of constitutionally required notice necessarily denies a defendant the fundamental right to a fair trial. "Such errors abort the basic trial process.. or deny it altogether." (Rove v. Clark 478 U.S. 570, 577 (1986)).

Accordingly, petitioner was deprived of "Notice" of the charges against him, as well as, denied the ability to be heard, thereby denying his right to due process, and requiring reversal of his conviction.

Furthermore, petitioner claims that denying him notice is a "Plain Error." "To constitute 'Plain Error,' error must be so obvious and substantial or so serious and manifest that it affects very integrity of trial process, and error is not plain unless it is error under settled law of Supreme court or Circuit." (In re Sealed Case, 99 F.3d 1175, 321 U.S. App. D.C. 324 (1996)).

Lack of notice is such settled Supreme Court law that affects very integrity of trial process, (see Armstrong v. Manzo, 855 S. Ct. 1187, 1190, 380 U.S. 545 (1965)), and prejudice to petitioner is manifest in this: He was convicted of a crime that the court lacked jurisdiction to convict him of, and resulted in the removal of a juror favorably disposed towards him.

II

Petitioner Denied Constitutional Right To Jury

Trial, By Trial Court Dismissing Deliberating

Juror Based Upon Erroneous Instruction


In the instant case it is unquestioned that Juror Kelly was removed because of his refusal to find petitioner guilty of P.C. 261.5 as a lesser included offense of P.C. 261. As discussed above, this was clearly an erroneous instruction. It is because of this erroneous instruction that petitioner asserts that all of his convictions must be reversed, and not just the conviction of P.C. 261.5.

"In California, an erroneous refusal to give a requested instruction or the giving of an erroneous instruction is not reversible error unless it results in a miscarriage of justice." (People v. Smith (1968) 265 Cal. App. 2d. 775, 779-80, fn. omitted). "If it is probable that in the absence of a misleading instruction the jury would not have returned the verdict complained of, then there has been a miscarriage of justice within the meaning of the constitutional provision." (People v. Rogers (1943) 22 Cal. 2d 787, 807; People v. Jenkins (1969) 275 Cal. App. 2d 545, 551).

It is evident that had the court not given the erroneous instruction petitioner would not have been convicted of P.C. 261.5. But petitioner contends that had juror Kelly not been removed from the jury, he would not have been found guilty at all. At most he would have had a hung jury. This instruction infected the jury process by allowing the court to remove a deliberating jury that was favorably disposed towards petitioner. (see Estelle v. McGuire 112 S. Ct. 475, 482, 502 U.S. 62 (1991) ["Did ailing instruction

by itself so infect the entire trial that the resulting conviction violates due process.]).


A.  Juror Kelly Was Removed Due To

An Erroneous Assessment Of Facts By

Trial Court


Juror Kelly was removed, over defense counsel's objection, because the court believed that it had given instructions according to the law, and that juror Kelly was refusing to follow those lawful instructions.  A trials judge's discretion in removing a juror is not to be disturbed absent a showing of bias or prejudice to defendant or to any other party. "Prejudice includes discharge of juror without factual support, or for legally irrelevant reason." (U.S. v. Fajardo (11th Cir. 1986) 787 F.2d 1523).  The court based juror Kelly's removal on a erroneous view of law, because the instruction was clearly in error.  "... Court abuses its discretion when it bases its decision on an erroneous view of law or a clearly erroneous assessment of the facts. (Koon v. U.S. 116 S. Ct. 2035 (U.S. Cal 1996); U.S. v. Campos 217 F.3d 707 (9th Cir. 2000).

Petitioner concedes that he does not have the right to be tried by a certain jury or juror.  However, "A defendant has a reasonable expectation that, barring unforeseen circumstances, he will be tried by the jury selected. The trial judge is not at liberty to interfere with the jury selected unless it has adequate cause." (United States v. Nelson 102 F.3d 1344, 1349 (1996)). The trial court did not have adequate cause to remove jury Kelly.  His unwillingness to follow an erroneous instruction, even if he did not know

it was erroneous, can not in itself validate petitioner's conviction.  "If
it appears that error in giving an improper instruction was likely to mislead
the jury and thus become a factor in its verdict, it is prejudicial and ground
for reversal." (Henderson v. Harnischfeger Corp. (1974) 12 Cal. 3d. 663, 670).

　　　This erroneous instruction played the largest role in petitioner's
conviction.  It is the sole cause for the removal of a deliberating juror
that was favorably disposed towards petitioner, and it is reasonably probable
that had juror Kelly not been removed that petitioner would have received
a more favorable verdict. (People v. Watson (1956) 46 Cal. 2d. 818, 836;
Chapman v. California 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d. 705 (1967);
see also Exhibit 'A').


III.

Petitioner Denied 6th Amendment Right

To Effective Assistance Of Counsel


　　　That a defendant is entitled to effective assistance of counsel in
all phases of his trial needs no citation.  During petitioners motion for
new trial, trial counsel failed to raise all arguable issues.  "The
constitutional mandate is addressed to the action of the state in obtaining
a criminal conviction through a procedure that fails to meet the standards
of due process of law.  Unless a defendant charged with a serious offense
has counsel able to invoke the procedural and substantive safeguards that
distinguish our system of justice, a serious risk of injustice infects the
trial itself.  When the state obtains a criminal conviction through such a
trial, it is the state that unconstitutionally deprives the defendant of his

22

liberty." (Cuyler v. Sullivan, 446 U.S. 335, 343, 100 S. Ct. 1708, 1715 (1980)).

"The object or function of a motion for a new trial is to secure the correction of, or to give the trial court an opportunity to correct errors occurring in the conduct of trial, without the delay, expense, or inconvenience of an appeal, and to preserve such errors for appellate review." (Corpus Juris Secundum, New Trial §1 (b) Object; Function). Trial counsel failed to raise: 1) that P.C. 261.5 is not a lesser included offense to P.C. 261, and that by trial court giving that instruction it violated petitioner's constitutional right to "Notice of the Charges" against him, and 2) that trial court violated petitioner's constitutional right to trial by jury, by removing a deliberating juror based upon an erroneous instruction. It should be noted that prior to petitioner's motion for new trial being heard, trial counsel took an affidavit from juror Kelly which demonstrated his belief in petitioner's innocence. (see Exhibit 'A')

The lack of these issues in petitioner's motion for new trial resulted in the motion being denied. Furthermore, the court could not correct its errors, nor were these errors adequately preserved for appellate review. These oversights by counsel cannot be explained away by trial tactics, because there can be no reasonable reason to leave these issues out and have petitioner go to prison. "Because the right to counsel is so fundamental to a fair trial, the constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits." (Evitts v. Lucey, 469 U.S. 387, 105 S. Ct. 830, 836 (1985)).

A. <u>Trial Court Denied Petitioner His</u>

<u>6th Amendment Right To Effective</u>

<u>Assistance Of Counsel</u>

"A defendant may also be deprived of his or her right to effective
assistance of counsel if the government interferes in certain ways with the
ability of counsel to make independent decisions about how to conduct the
defense.  In these situations where the defendant has been actually or
constructively denied the assistance of counsel, the defendant need not show
prejudice." (Strickland v. Washington 466 U.S. 668, 692, 104 S. Ct. 2052,
2067 (1984)

The trial court informed the prosecution and defense, at a critical
stage in the proceedings, that it would be instructing the jury sua sponte
that P.C. 261.5 was a lesser included offense of P.C. 261. This interfered
with counsels ability to make independent decisions about how to conduct a
defense, by not allowing counsel to present a defense at all to this charge.
"Moreover, the right to counsel is directly implicated.  That right is next
to meaningless unless counsel knows and has a satisfactory opportunity to
respond to the charges against which he or she must defend." (Sheppard v.
Rees (9th Cir. 1989) 909 F.2d 1234).  Since P.C. 261.5 is not a lesser
included offense of P.C. 261, petitioner was not only denied "Notice" of the
charges against him, he was also denied his right to effective assistance
of counsel and petitioner need not show prejudice.  "We have spared the
defendant the need of showing probable effect upon the outcome, and have simply
presumed such effect, where assistance of counsel has been denied entirely
or during a critical stage of the proceedings.  When that has occurred, the

likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." (Mickens v. Taylor 122 S. Ct. 1237, 1240-41 (2002)).

IV

Petitioner Denied Effective Assistance Of

Appeal Counsel, By Counsels Failure To

Raise All Arguable issues

Petitioner filed a timely notice of appeal and was represented by Barry Helft in both the Appeal Court and the California Supreme Court. All of the issues petitioner is currently bringing in the writ were not raised in petitioners direct appeal. "A criminal defendant is entitled to effective assistance of counsel on appeal.." (In re Spears (1984) 157 Cal. App. 3d. 1203, 204 Cal. Rptr. 333; see also Evitts v. Lucey, 105 S. Ct. 836, 837 (1985)). Such assistance includes counsel's duty to brief all arguable issues. "Appellate counsel has a duty to brief all arguable issues. The question of ineffective assistance of appellate counsel must be decided on a case-by-case basis and will depend on whether counsel failed to raise assignments of error that were crucial in the context of the particular circumstances at hand." (In re Jones (1994) 27 Cal. App. 4th 1203, 33 Cal. Rptr. 2d. 469; In re Smith (1970) 3 Cal. 3d. 192, 90 Cal. Rptr. 1; see also Delgado v. Lewis 223 F.3d 976, 980-82 (9th Cir. 2000)).

The fact that appellate counsel failed to raise that, 1) Petitioner was denied due process right to notice of charges against him, because P.C. 261.5 is not a lesser included offense of P.C. 261, 2) instructional error deprived petitioner of his right to trial by jury, 3) petitioner was denied constitutional right to trial by jury by the removal of a deliberating juror

25

based on an erroneous instruction, 4) petitioner received ineffective assistance of trial counsel, by trial counsel not raising on arguable issues in motion for new trial, and 5) petitioner was denied his due process right to a fair trial and his constitutional right to effective assistance, by trial court interfering with defense counsel's ability to present a defense. (see arguments, points and authorities I-III above in support of these issues).

These issues were crucial in the particular circumstances of petitioner case because they went to the very heart of his conviction. A competent attorney would have seen at least the issues of the instructional error and the effect it had upon the removal of the juror. Mr. Helft argued most strenuously that juror Kelly should not have been removed during deliberations, but only focused on his belief that juror Kelly had a right to vote for nullification. While researching the basis for Mr. Kelly's removal, he should have realized that the count that Mr. Kelly was having problems with, was the very same count that petitioner's trial attorney had objected to. There can be no sound legal reason why Mr. Helft did not discover these issues, therefore, he rendered a constitutionally deficient performance and prejudiced petitioner. (see Carter v. Bowersox, 265 F.3d 705, 715-16 (8th Cir. 2001); see also Mason v. Hanks 97 F.3d 887, 894 (7th Cir. 1996) [Counsel's failure to raise obvious and significant issues was ineffective assistance because it was without a legitimate strategic purpose.]).

V.

Cumulative Effect Of Errors Denied

Petitioner Constitutional Right To Fair Trial

Petitioner's trial had many errors, but if the court does not find that any one of these errors is sufficient to overturn his conviction of itself, then petitioner contends that taken as a whole they rise to the level of prejudice and require reversal of his convictions. "The cumulative effect of errors may deprive a petitioner of the due process right to a fair trial." (Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002), see also Kyles v. Whitley, 514 U.S. 419, 434-35, 115 S. Ct. 1555 (1995), and Williams v. Woodford, 384 F.3d 567 (9th Cir. 2004)). "In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, cumulative effect of multiple errors may still prejudice defendant so as to require reversal. (U.S. v. Frederick, 78 F.3d 1370 (1996); see also Ceja v. Stewart, 97 F.3d 1246, 1254 (9th Cir. 1996); and U.S. v. Berry, 627 F.2d 193, 200-01 (9th Cir. 1980)).

The domino effect of these errors is clearly evident. The moment the trial court decided to give the erroneous instruction, that instruction infected the rest of petitioner's trial. Had the trial court not given the erroneous instruction, 1) petitioner would not have been convicted of P.C. 261.5, 2) juror Kelly would not have been removed from the jury, and 3) petitioner would not have been convicted of three felonies. (See Exhibit 'A'). "A new trial is required on basis of cumulative effect of errors only when errors when combined, so infected jury's deliberations that they had substantial influence on outcome of trial. (U.S. v. Thornton, 1 F.3d 149, 156 (3rd Cir. 1993). Juror

Kelly was not swayed by the governments case. Due to his removal, petitioner was denied an advocate in the jury room. There can be no greater infringement on the jury's deliberations than this. For these reasons, the cumulative effect of these errors prejudiced petitioner and denied him his constitutional right to a fair trial, and require that his convictions be reversed.


## Reason For Delay


Delay is attributated to petitioner's lack of capacity to represent himself and the scarcity of channels through which legal assistance was available to him.

Petitioner did file a direct appeal from his conviction on or about February 09, 1996. My attorney at the time Barry Helft failed to discover these issues and raise them in my direct appeal. The California Supreme Court denied petitioner's appeal on May 07, 2006. Although petitioner was out on parole at this time, being a layman at law he still did not know about the issues he is now raising, and did not have the financial ability to hire legal aid.

On or about Mid June of 2001 while discussing the outcome of the Supreme Court decision of my case with Robert Patterson, a former inmate, petitioner was for the first time instructed to find out whether P.C. 261.5 was a lesser included offense of P.C. 261, because if it is then I had a good ineffective assistance of counsel claim. Petitioner immediately called Barry Helft and asked him if he ever found out if P.C. 261.5 was actually a lesser included offense of P.C. 261. He said no he hadn't because it did not seem relevant. Petitioner then asked him, if my counsel had advised me to testify because

it wasn't, but it really was, would that give me a good ineffective assistance
of counsel claim. He told me that he would look into it and get back to me.
At this time he also told me that he was considering taking my case to the
United States Supreme Court. When I did not hear form him for about two weeks,
I went to the San Jose Law Library and with the aid of the librarian found
in West. Ann's Annotated Penal Code, under penal code section 261 that P.C.
261.5 was not a lesser included offense of P.C. 261. When I got home I called
Mr. Helft but he was not in, so I left a message telling him that my attorney
was right, P.C. 261.5 was not a lesser included offense of P.C. 261. I then
asked what that meant for my case. A few days later I received a call from
Mr. Helft, and he told me that I was right and that he should have caught that.
He stated that he would write me a brief, but that I would have to submit it
because technically his duty ended when the Supreme Court denied my appeal.
He told me he would be in touch in a few weeks. I did not personally hear from
Mr. Helft again until 2003. Both my family and I called him and left messages
on several occasions that were never returned.

  Petitioner could not find and present these issues himself because
he was arrested in September of 2001. I did go to the law library while in
Santa Clara County Jail, but the library was highly inadequate. Books had
pages missing, and the whole books they did have were old. In 2002 the library
was so bad that they went with a research agency to give inmates better access
to law materials. You had to submit a form detailing what you were looking
for, and then wait about a week to get the results back. The down side to
this form of legal research was that if you did not know what you were looking
for, it was almost impossible to get useful information. So not only did I
not find these issues then, I did not know what paperwork I had to file.

  In August 2002, I found out through my trial attorney Patrick Hoopes

that Mr. Helft had e-mailed him and stated that he would not be filing anything else on my behalf because he felt that he had raised all arguable issues. A few days later I was taken to CDC Reception Center, San Quentin State Prison. I was then sent to Avenal State Prison on or about mid September 2002. At both San Quentin and Avenal State Prison you have to put a request in to go to the law library. I got to go only once while at San Quentin, before I was transferred to Avenal. When I first got to Avenal I had to wait as long as three weeks to get into the law Library. As they tried to fix the scheduling problems, there were times I would only go once a month. At one point I had to file a 602 grievance to get to the library because I didn't go for almost 3 months. However, in 2006 things have gotten better. I go at least once a week, but for only 2 hours at a time.

For the last four years, I have diligently been working on a habeas corpus. When I first filed on May 14, 2003, I was denied because I was no longer in "custody" for habeas corpus purposes on my old conviction. I then field a second petition on August 21, 2003 alleging that my current sentence was enhanced by an unconstitutional prior conviction, which was denied without the court reviewing all the issues. (see attached Order). On September 17, 2003, petitioner field a habeas corpus in California Court of Appeals, which was denied without explanation. I then tried to perfect my appeal not only for the California Supreme Court, but for the Federal Courts as well, so that I could receive the relief the law is clear I'm entitled to. So on October 21, 2004, petitioner filed a habeas corpus to the California Supreme Court, which was denied August 31, 2005. Petitioner's current habeas corpus arrived in federal court on April 18, 2006. There is a current Motion to Dismiss Petition as untimely pending before the court.

On or about February 2006, Avenal State Prison received law computers. On or About April 2006, as a library clerk I received training on how to use these computers.  On August 04, 2006 while using the computer to aid me in writing a traverse to the motion to dismiss, I found out two things: 1) More than likely I am going to have my habeas corpus denied because in 2001 the United Sates Supreme Court ruled that the only way to attack a unconstitutional prior that has enhanced your current sentence is if you can prove your actually innocent or if you were denied counsel altogether, and 2) I should have field a Coram Nobis, because it's the only avenue I can take to challenge a conviction I've already served the time for.

As I have stated, as a layman in law I had never heard of a Coram Nobis until now.  Neither the law library clerks (which are inmates) nor the law librarian have heard of a Coram Nobis either. In the forms book the library carries, the Coram Nobis form is not in it.  Had it not been for the computer, I still would not know of the Coram Nobis Writ of Error.  In my current capacity I have done the best I can in diligently researching my case and presenting the facts to the court.

If, however, the court does not find the above stated reasons sufficient to explain delay, petitioner believes that the court should still determine petitioner's case on its merits because he has had several fundamental constitutional rights violated.  "But where a fundamental constitutional right has been denied, an accused should not be precluded from relief because he cannot satisfy a court that he had good cause for any delay in seeking it." (Farnsworth v. U.S. 232 F.2d 59, 98 U.S. App. D.C. 59 (1956)).  Petitioner's fundamental constitutional rights to "Notice", trial by jury, and effective assistance of both trial and appeal counsel were denied.  Therefore, court should grant relief to petitioner even if it doesn't find good cause for delay.

## ALLEGATIONS

1.  Petitioner denied Due Process Right to "Notice" of the Charges against him.

2.  Petitioner denied Constitutional Right to Jury Trial, by trial court dismissing a deliberating juror based upon an erroneous instruction.

3.  Petitioner denied his 6th Amendment Right to Effective assistance of counsel.

4.  Petitioner denied 6th Amendment Right to Effective assistance of Appeal counsel, by counsel's failure to raise all arguable issues.

5.  Cumulative Effect of errors denied petitioner his Constitutional right to a fair trial.


For a detailed discussion on these allegations, please see attached Arguments and Points and Authorities.

## PRAYER

Wherefore, petitioner prays that a Writ of Error Coram Vobis be issued directing that the judgment and sentence in case number 178305 be vacated or, in the alternative, that respondent show cause, if any, why the judgment and sentence should not be set aside, and for such other and further relief as to what the court may deem just and equitable.


Dated: 5/29/07


Respectfully submitted,



ARASHEIK WILLIAMS
Petitioner

CONCLUSION

For the reasons stated, petitioner was denied his constitutional right to due process, effective assistance of counsel, and a fair trial.., and the judgment of conviction must be reversed and petitioner granted a new trial.

Dated: 5/29/07

Respectfully submitted,

ARASHEIK WILLIAMS

Petitioner

I am the petitioner in this action.  All facts alleged in the above document, not otherwise supported by citations to the record, exhibits, or other documents, are true of my own personal knowledge.

I declare under penalty of perjury that the above is true and correct and that this declaration was executed on *MAY 29, 2007*  at Avenal, California

Date: *5/29/07*

ARASHEIK WILLIAMS

Petitioner

1  LAW OFFICES OF THE PUBLIC DEFENDER
   JOSÉ R. VILLARREAL #96091
2  KATHARINE V. ALEXANDER, #59070
   County of Santa Clara
3  70 West Hedding Street
   First Floor, West Wing
4  San Jose, CA  95110
   Telephone:  299-7700
5
   Attorneys for Defendant
6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF SANTA CLARA

10 THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                          )   No. 178305
11                            Plaintiff,  )
                                          )   DECLARATION OF
12                  -vs-                   )   JAMES KELLY
                                          )
13 ARASHEIK WESLEY WILLIAMS,              )
                                          )
14                            Defendant.  )
   _____)

15

16      I, JAMES KELLY, declare:

17      I was a juror in the case of <u>People v. Arasheik Wesley</u>

18 <u>Williams</u>;

19      I participated in jury deliberations in the Williams case;

20      Our deliberations resulted in a Not Guilty verdict as to

21 Counts 1, 2 and 3 of the Information;

22      At this point, I was involuntarily removed from the jury panel

23 by the trial judge;

24      Had I been allowed to remain a juror, I was prepared to vote

25 Not Guilty on all the remaining counts.

26 Dated:  May 22 , 1995

27

28                                      _____
                                         JAMES KELLY

   EXHIBIT M

 

FILED

JUN 0 5 2003

KIRI TORRE
Chief Executive Officer
Superior Court of CA County of Santa Clara

BY _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re                              )    No. 178305
                                   )
    ARASHEIK WILLIAMS,             )    ORDER
                                   )
On Habeas Corpus                   )
                                   )
_____)

    ARASHEIK WILLIAMS, (hereinafter Petitioner), petitions for a writ of habeas corpus alleging that ineffective assistance of counsel in case number 178305.  Petitioner states that he was released on case number 178305 in July 2000.

    In Maleng v. Cook (1989) 490 U.S. 488, the United States Supreme Court stated that "once the sentence imposed for a conviction has completely expired, the collateral consequences of that conviction are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack upon it." (Id. at 492.)  In particular, the Court found that a habeas petitioner does not remain "in custody" under a conviction after

1

the sentence for it has fully expired, merely because of the possibility that the prior conviction will be used to enhance the sentences imposed for any subsequent crimes of which he is convicted.  Even where the possibility actually materializes, and a sentence on a person's new case actually is enhanced because of a prior, a "different conclusion" is not "require[d]."  (Ibid.) The court further explained "When the second sentence is imposed it is pursuant to the second conviction that the petitioner is incarcerated and is therefore 'in custody.'"  (Id. at 492-493.)

In this case, as petitioner has stated he was ``released'' on case no. 178305 in 2000, it appears that he cannot now bring a habeas petition on that case.  Additionally, petitioner has not shown that he is serving any enhanced sentenced due to this prior so that he could challenge the prior.

For the above reasons, the petition is DENIED.

DATED: _JUNE 3_ , 2003

ALFONSO FERNANDEZ
JUDGE OF THE SUPERIOR COURT

cc:  Petitioner
     District Attorney
     Research

2

FILED

SEP 17 2003

KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara

BY _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re                                    )    No. 178305
                                         )
ARASHEIK WILLIAMS                        )    O R D E R
                                         )
                                         )
                                         )
_____  )

ARASHEIK WILLIAMS (Petitioner) has filed another petition for writ of habeas corpus on the above entitled case. Petitioner alleges he received ineffective assistance of counsel on the above entitled case. Petitioner alleges prejudice based on three alleged errors during his trial: (1) the addition of a jury instruction for Ca. Penal C. Sec. 261.5 (unlawful sexual intercourse with minor), (2) the dismissal of one juror, and (3) the admission of testimony regarding "Battered Wife Syndrome".

Petitioner's first petition on case no. 178305 was denied on the grounds that petitioner was no longer in custody on the sentence imposed under case no. 178305. Petitioner now alleges that his present sentence on Santa Clara case no. CC121730 has been enhanced by his prior under case no. 178305.

The record reflects that petitioner's prior for PC 261.5 has not enhanced his present sentence; the prior conviction has not even been alleged. Accordingly, any error alleged to the PC 261.5 conviction is not properly raised now. Rather, the only prior that was alleged was his conviction for PC 245. In that respect, the present petition alleges evidence of "Battered Wife Syndrome" was improperly admitted.

1

1    In order to demonstrate ineffective assistance of counsel, a defendant must show (1) that his or her

2 counsel's performance was deficient because the lawyer's representation fell below an objective standard

3 of reasonableness under prevailing professional norms and (2) counsel's deficient performance subjected

4 the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result

5 would have been more favorable to the defendant. (Strickland v. Washington (1984) 466 U.S. 668, 687-

6 688, cited in In Re Harris (1993) 5 Cal.4th at 832-833; In Re Alvernas (1992) 2 Cal.4th 924, 936-937 and

7 People v. Haskett (1990) 52 Cal.3d 210, 248.)

8    Here, petitioner contends that testimony of Battered Wife Syndrome was improperly admitted

9 where the victim never "recanted, minimized, or denied" the alleged abuse. It has not been established

10 that testimony regarding Battered Wife Syndrome was presented, as the victim was not petitioner's wife.

11 However, assuming there was some type of syndrome evidence, as this was a rape case, it appears the

12 testimony was proper. Such syndrome evidence has been admitted solely to disabuse jurors of "common

13 sense" misconceptions about the behavior of persons in the affected groups, such as rape victims and

14 abused children, and not to prove a fact in issue. People v. Erickson (1997) 57 Cal.App.4th 1391, 1401.

15 Here, the record reflects that the victim gave different explanations about her injuries. It appears it was

16 appropriate to permit testimony to disabuse jurors of misconceptions about behavior by rape victims.

17    For the above reasons, the petition is DENIED.

18

19

20 DATED: Sept. 11, 2003

21    ALFONSO FERNANDEZ
    JUDGE OF THE SUPERIOR COURT

22 cc: Petitioner
    District Attorney
23    Research



24

25

26

27

28

2



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

In re ARASHEIK WESLEY WILLIAMS,

on Habeas Corpus.

H027889
(Santa Clara County
Super. Ct. No. 178305)

**FILED**

SEP 1 7 2004

Court of Appeal - Sixth Dist.
BY _____
                    DEPUTY

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Rushing, P.J., Mihara, J., and Walsh, J.,* participated in this decision.)

Dated ___SEP 1 7 2004___      ___RUSHING, P.J.___      P.J.

*Judge of the Santa Clara County Superior Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.

S128616

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re ARASHEIK WILLIAMS on Habeas Corpus

Petition for writ of habeas corpus is DENIED.

SUPREME COURT
FILED

AUG 3 1 2005

Frederick K. Ohlrich Clerk

DEPUTY

_Chief Justice_

H030893

Arasheik Wesley Williams
CDC:J-95411
California State Prison - Avenal
P.O. Box 9
Avenal, CA 93204

Party Role Code:   pet

IN THE COURT OF APPEAL OF THE STATE OF CALIFORN

SIXTH APPELLATE DISTRICT

THE PEOPLE,

      Plaintiff and Respondent,

      v.

ARASHEIK WILLIAMS,

      Defendant and Appellant.

H030893
(Santa Clara County
Super. Ct. No. 178305)



Court of Appeal - Sixth App. Dist.

**F I L E D**

DEC 21 2006

MICHAEL J. YERLY, Clerk

By _____
           DEPUTY

BY THE COURT:

      Having received the order of the California Supreme Court transferring this matter to this court for consideration in light of *Hagan v. Superior Court* (1962) 57 Cal.2d 767, this court finds that this petition is substantially identical to a prior petition that was summarily denied by this court.  (*People v. Williams*, H030639, summarily denied October 18, 2006.)  The petition for writ of coram vobis is denied.

      (Premo, Acting P.J., Elia, J., and Duffy, J., participated in this decision.)

DEC 21 2006

PREMO, J.

Dated _____    _____ Acting P.J.

SUPREME COURT
FILED

NOV 16 2006

Frederick K. Ohlrich Clerk
_____
DEPUTY

No. S147914

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, Plaintiff and Respondent,

*v.*

ARASHIEK WILLIAMS, Defendant and Appellant.

The above entitled matter is transferred to the Court of Appeal, Sixth Appellate District, for consideration in light of *Hagan v. Superior Court* (1962) 57 Cal.2d 767. In the event the Court of Appeal determines that this petition is substantially identical to a prior petition, the repetitious petition must be denied.

_____
**GEORGE**
*Chief Justice*

S151487

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

THE PEOPLE, Respondent,

v.

ARASHIEK WESLEY WILLIAMS, Petitioner.

---

The petition for writ of error corum vobis is denied.

SUPREME COURT
**FILED**

MAY – **9** 2007

Frederick K. Ohlrich Clerk

---

Deputy

---

GEORGE

---

Chief Justice



ARASHEZK WILLIAMS J-95411
110-2-03L
AVENAL STATE PRISON
P.O. BOX 8
Avenal, CA 93204

AVENAL STATE PRISON

NORTHERN DIST. OF CALIFORNIA
280 South First st #-2112
San Jose, CA 95113-3008

LEGAL MAIL

LEGAL MAIL
MAY 3 0 2007
AVENAL STATE PRISON
MAILROOM

$1.99
US POSTAGE
FIRST CLASS